```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - x
                                      :
UNITED STATES OF AMERICA
                                      :
            - v. -
                                      :
SCOTT STAMMERS,
   a/k/a "Shaun Simmons,"             :
   a/k/a "S1,"
PHILIP SHACKELS,                      :
   a/k/a "Paul Smith,"
   a/k/a "P1,"                        :
YE TIONG TAN LIM,
   a/k/a "Giorgio,"                   :
   a/k/a "Triad,"
ALLAN KELLY REYES PERALTA,            :
   a/k/a "Allan Kelly Peralta Reyes,"
   a/k/a "Kelly," and                 :
ALEXANDER LNU,
   a/k/a "Alexander Checo,"           :
   a/k/a "Alexander Semencov,"
   a/k/a "A1,"                        :

            Defendants.              :

                                      :
- - - - - - - - - - - - - - - - - - - x
```

**ORIGINAL**

**INDICTMENT**

S8 13 Cr. 579

## OVERVIEW

1.   During 2012, law enforcement agents seized over 30 kilograms of methamphetamine that had been supplied by two men: YE TIONG TAN LIM, a/k/a "Giorgio," a/k/a "Triad," and ALLAN KELLY REYES PERALTA, a/k/a "Allan Kelly Peralta Reyes," a/k/a "Kelly," the defendants.  Two other men -- SCOTT STAMMERS, a/k/a "Shaun Simmons," a/k/a "S1," and PHILIP SHACKELS, a/k/a "Paul Smith," a/k/a "P1," the defendants -- had been responsible for storing and safekeeping the methamphetamine after it had been

delivered by LIM and REYES PERALTA.  The methamphetamine was described as being from North Korea, and it had a purity of over 99%.

2.    During 2013, the four above-named defendants again worked on a deal involving methamphetamine said to be from North Korea.  This time, the methamphetamine volume was 100 kilograms -- and its ultimate destination was New York.

3.    In furtherance of the 2013 methamphetamine deal, YE TIONG TAN LIM, a/k/a "Giorgio," a/k/a "Triad," and ALLAN KELLY REYES PERALTA, a/k/a "Allan Kelly Peralta Reyes," a/k/a "Kelly," the defendants, as with the 2012 shipment, served as the suppliers of the drugs.  They provided samples of the methamphetamine for testing in the New York market; and they caused a "cover load" of innocuous goods to be dispatched, as a test run for the methamphetamine shipment.

4.    SCOTT STAMMERS, a/k/a "Shaun Simmons," a/k/a "S1," and PHILIP SHACKELS, a/k/a "Paul Smith," a/k/a "P1," the defendants, also worked in furtherance of the 2013 methamphetamine deal.  STAMMERS and SHACKELS agreed to store and transport LIM and REYES PERALTA's 100-kilogram methamphetamine shipment.  STAMMERS and SHACKELS also arranged for LIM and REYES PERALTA's methamphetamine sample to be surreptitiously shipped from one country to another, in advance of the sample's planned shipment to New York.

- 2 -

5.    In the course of the 2013 methamphetamine deal, ALEXANDER LNU, a/k/a "Alexander Checo," a/k/a "Alexander Semencov," a/k/a "A1," the defendant, agreed to serve as the point person, or "ground commander," for the 100-kilogram methamphetamine shipment.  ALEXANDER LNU is the sergeant-at-arms of a particular motorcycle gang, and he agreed that eight armed associates from his motorcycle gang would provide security for the methamphetamine.

## DEFENDANTS

6.    SCOTT STAMMERS, a/k/a "Shaun Simmons," a/k/a "S1," the defendant, is a citizen of the United Kingdom and a resident of Thailand.

7.    PHILIP SHACKELS, a/k/a "Paul Smith," a/k/a "P1," the defendant, is a citizen of the United Kingdom and a resident of Thailand.

8.    YE TIONG TAN LIM, a/k/a "Giorgio," a/k/a "Triad," the defendant, is a citizen of the People's Republic of China and a resident of Hong Kong and the Philippines.

9.    ALLAN KELLY REYES PERALTA, a/k/a "Allan Kelly Peralta Reyes," a/k/a "Kelly," the defendant, is a citizen and a resident of the Philippines.

10.    ALEXANDER LNU, a/k/a "Alexander Checo," a/k/a "Alexander Semencov," a/k/a "A1," the defendant, whose

- 3 -

photograph is attached as Exhibit A to this Indictment, is a resident of Thailand.

**COUNT ONE**

**CONSPIRACY TO IMPORT METHAMPHETAMINE INTO THE UNITED STATES**

The Grand Jury charges:

11.   From at least in or about 2012, up to and including the date of the filing of this Indictment, in the Southern District of New York and elsewhere, SCOTT STAMMERS, a/k/a "Shaun Simmons," a/k/a "S1," PHILIP SHACKELS, a/k/a "Paul Smith," a/k/a "P1," YE TIONG TAN LIM, a/k/a "Giorgio," a/k/a "Triad," ALLAN KELLY PERALTA PERALTA, a/k/a "Allan Kelly Peralta Reyes," a/k/a "Kelly," and ALEXANDER LNU, a/k/a "Alexander Checo," a/k/a "Alexander Semencov," a/k/a "A1," the defendants, who will first enter the United States in the Southern District of New York, and others known and unknown, intentionally and knowingly did combine, conspire, confederate and agree together and with each other to violate the narcotics laws of the United States.

12.   It was a part and an object of the conspiracy that SCOTT STAMMERS, a/k/a "Shaun Simmons," a/k/a "S1," PHILIP SHACKELS, a/k/a "Paul Smith," a/k/a "P1," YE TIONG TAN LIM, a/k/a "Giorgio," a/k/a "Triad," ALLAN KELLY REYES PERALTA, a/k/a "Allan Kelly Peralta Reyes," a/k/a "Kelly," and ALEXANDER LNU, a/k/a "Alexander Checo," a/k/a "Alexander Semencov," a/k/a "A1,"

the defendants, and others known and unknown, would and did
distribute, and possess with intent to distribute, a controlled
substance, to wit, five hundred grams and more of a mixture or
substance containing a detectable amount of methamphetamine,
intending and knowing that such substance would be imported into
the United States from a place outside thereof, in violation of
Sections 959(a), 959(c), 960(a)(3), and 960(b)(1)(H) of Title
21, United States Code.

### Overt Acts

13.  In furtherance of said conspiracy and to effect
the illegal object thereof, SCOTT STAMMERS, a/k/a "Shaun
Simmons," a/k/a "S1," PHILIP SHACKELS, a/k/a "Paul Smith," a/k/a
"P1," YE TIONG TAN LIM, a/k/a "Giorgio," a/k/a "Triad," ALLAN
KELLY PERALTA PERALTA, a/k/a "Allan Kelly Peralta Reyes," a/k/a
"Kelly," and ALEXANDER LNU, a/k/a "Alexander Checo," a/k/a
"Alexander Semencov," a/k/a "A1," the defendants, committed the
following overt acts, among others:

### January 2013: Asian Country-1

### As a Prelude to a Larger Shipment,
### LIM and REYES PERALTA Agree to Send a One-Kilogram Sample of
### North Korean Methamphetamine to the United States

a.  On or about January 24, 2013, in a country
in Asia ("Asian Country-1"), LIM and REYES PERALTA met with an
individual who represented himself to be a narcotics trafficker,
but who was in fact a Drug Enforcement Administration

confidential source ("CS-1"); the meeting was audio- and video-recorded, and during the meeting:

      i.   CS-1 told LIM and REYES PERALTA that he (CS-1) had been told that their (LIM and REYES PERALTA's) methamphetamine "comes from the 'NK' place," meaning North Korea; LIM and REYES PERALTA each responded: "Yes."

      ii.   CS-1 asked to confirm that the methamphetamine that LIM and REYES PERALTA could now offer was of the same variety as a certain shipment of methamphetamine that LIM and REYES PERALTA previously had supplied; in response, LIM stated: "Yes.  Because my boss only gets from the original source."

      iii. LIM stated that his drug-trafficking organization is the only one able to procure methamphetamine from North Korea: "Because before, there were eight.  But now only us, we have the NK product. . . . [I]t's only us who can get from NK."  Later, LIM confirmed: "Our product is really that from NK."

      iv.  In response to CS-1's request to visit methamphetamine production facilities in North Korea, LIM stated: "No, we can't go to North Korea . . . We take it out. If we don't talk Korean language, they'll have suspicions.  And all the, the NK government already burned all the labs.  Only our labs are not closed. . . . To show Americans that they are

- 6 -

not selling it any more, they burned it.  Then they transfer to
another base."

        v.   LIM asked whether the methamphetamine
that he and REYES PERALTA provided would be delivered to the
United States: "But what we are doing for New York, the ones
from us [methamphetamine]?  The ones you're going to get from
us, you're going to New York?"; CS-1 confirmed, "Yes."

        b.   On or about January 25, 2013, in Asian
Country-1, LIM and REYES PERALTA met with CS-1 and an individual
who represented himself to be a narcotics trafficker, but who
was in fact a Drug Enforcement Administration confidential
source ("CS-2").  The meeting was audio- and video-recorded, and
during the meeting:

        i.   When asked whether LIM could deliver
300 kilograms of methamphetamine to Asian Country-1, LIM
confirmed: "Yeah."  After discussion about the price of the
methamphetamine, LIM was asked whether he could supply the
methamphetamine at $60,000 per kilogram, and LIM responded: "I
have to check, maybe tomorrow, I'll go to ask Hong Kong.  And
I'll give you the feedback after I come back."

        ii.   In response to CS-2's request for a 1-
kilogram sample of methamphetamine to be sent to New York for
testing in the market, LIM stated: "I have to talk to the boss,
because I don't have the sample right now."

iii. In response to CS-2's request for confirmation of the quality of the methamphetamine, LIM responded: "NK." CS-2 confirmed, "NK, ok, North Korea," and LIM replied: "Yes."

c.   On or about January 27, 2013, in Asian Country-1, LIM and REYES PERALTA met with CS-1 and CS-2 (collectively, the "CSes"). The meeting was audio- and video-recorded, and during the meeting:

i.   In response to a question about his (LIM's) meeting with his boss in Hong Kong, LIM stated: "It's good. We can, we can give you the sample as you wish."

ii.  LIM stated that the price of the sample would be: "Sixty-five," meaning $65,000.

iii. During a discussion of how to send a 1-kilogram sample of methamphetamine to New York by commercial carrier, LIM suggested labeling the package as "parts, auto parts."

### January 2013: Asian Country-1

### STAMMERS and SHACKELS Agree to Send Samples of Methamphetamine, Including North Korean Methamphetamine, for Testing in the United States

d.   On or about January 28, 2013, in Asian Country-1, STAMMERS met with CS-1 and CS-2. The meeting was audio- and video-recorded, and during the meeting:

    i. Referring to methamphetamine that STAMMERS previously had stored, CS-2 said that it had sold well in the United States: "people in New York, they went crazy . . . the places that we put it in the States, New York, all these-- close to Boston, all these places, I mean, they went crazy;" STAMMERS acknowledged: "Right."

    ii. STAMMERS indicated that supplying the CSes with North Korean methamphetamine would be difficult, "the NK stuff, it's expensive first of all, and it's so hard to get in", and agreed with the CSes' suggestion that STAMMERS supply samples of methamphetamine from various sources to the CSes in New York.  STAMMERS stated: "That's a good idea.  We send--what I will do is, I will source, and each one I will send to you . . . and you tell me, 'yes,' 'no,' and I think that's the safest way."

    iii. In response to CS-2's question about when STAMMERS could send samples of methamphetamine, STAMMERS noted that North Korean methamphetamine could be especially challenging to obtain, stating: "The NK one is gonna be difficult . . . What I'm gonna do is, I'm gonna leave here and call my guys, because Phil [SHACKELS] is the one dealing with this one, and I'm gonna find out when I can get a sample to you guys."

       iv.   STAMMERS asked if there was a "big market" in New York for another type of illegal drug.

       e.   On or about February 4, 2013, SHACKELS sent an e-mail message to STAMMERS and CS-2 in which he (SHACKELS) stated: (i) that he (SHACKELS) expected to shortly receive a sample of methamphetamine ("dvd's") and that he would arrange for it to be packaged and ultimately sent on to "the buyers in NY"; and (ii) that he (SHACKELS) had a connection to someone who "used to work in north korea making dvd's [methamphetamine]" and who has "good connects there for buying huge amounts" of methamphetamine -- "theretelling [sic] me the dvd's [methamphetamine] are basicaly [sic] legal there now and there's huge amountsbeing [sic] made."

### February - April 2013: Asian Country-1

### STAMMERS, SHACKELS, and REYES PERALTA Send Samples of Methamphetamine, Including North Korean Methamphetamine, to African Country-1 for Importation to the United States

       f.   On or about February 7, 2013, in a recorded telephone call with an individual said to be associated with the CSes' purported drug-trafficking organization ("Individual-1"), REYES PERALTA advised that it was difficult to mail the methamphetamine sample ("parts") out of Hong Kong and that it would be better for the methamphetamine sample to be picked up.

g.   On or about February 7, 2013, in a recorded telephone call with Individual-1, SHACKELS agreed to arrange the pick-up and shipment of a sample of methamphetamine to be provided by REYES PERALTA to the drug trafficking organization purportedly operated by the CSes.

h.   On or about February 10, 2013, REYES PERALTA sent an e-mail message to Individual-1 stating that he (REYES PERALTA) had communicated with SHACKELS and would be in touch with him (SHACKELS) regarding the delivery of the methamphetamine sample ("spare part").

i.   On or about February 11, 2013, SHACKELS sent an e-mail message to Individual-1 stating that he (SHACKELS) expected to ship methamphetamine samples obtained from, among other sources, "THE GUY YOU PUT ME IN TOUCH WITH" (REYES PERALTA).

j.   On or about February 14, 2013, STAMMERS sent an e-mail message to CS-2, among others, advising that he had confirmed the availability of methamphetamine samples.  STAMMERS wrote, in part: "Various supplier [sic] have confirmed the samples are ready for delivery to our courier boys. . . ."

k.   On or about February 22, 2013, SHACKELS sent an e-mail message to Individual-1 indicating that he (SHACKELS) was ready to arrange for the shipment of a methamphetamine sample being provided by REYES PERALTA: "our guy will pick up

- 11 -

spare parts tom[orrow], and bring to postal people to prepare. Then shipped to the address you provide asap."

l. On or about February 24, 2013, SHACKELS sent an e-mail message to Individual-1 requesting an address in a country in Africa ("African Country-1") to which to send the methamphetamine sample, and from where the methamphetamine sample would be further transported to the United States.

m. On or about February 25, 2013, REYES PERALTA sent an e-mail message to Individual-1 confirming, among other things, that the methamphetamine sample had successfully been handed off to SHACKELS, who would then ship the sample onward: "the spare parts was delivered to your man."

n. On or about March 4, 2013, SHACKELS sent an e-mail message to Individual-1 explaining that the shipment of methamphetamine samples from REYES PERALTA was on its way to him (SHACKELS). SHACKELS wrote: "there are 2 samples on route."

o. On or about March 7, 2013, STAMMERS sent an e-mail to Individual-1 containing the tracking number for a package being delivered to African Country-1; the package was intercepted by law enforcement agents, and it contained two samples of methamphetamine that were tested at more than 96% pure and more than 98% pure.

p.    On or about March 9, 2013, in Asian Country-1, STAMMERS and SHACKELS met with the CSes.  The meeting was audio- and video-recorded, and during the meeting:

i.    SHACKELS confirmed that two samples of methamphetamine "from these North Korean people -- sample 'A' and sample 'B'" -- had been shipped to the CSes.

ii.    STAMMERS stated that he had the samples tested before they were shipped to African Country-1, and they were very high quality ("Class A").

q.    On or about March 14, 2013, in response to a message advising REYES PERALTA that the methamphetamine samples had arrived at their trans-shipment point and would be sent on to New York ("the big market"), REYES PERALTA wrote, in part: "Thats good news."

r.    On or about April 5, 2013, STAMMERS sent an e-mail message discussing feedback that had been received with respect to the quality of two methamphetamine samples ("A" and "B") that STAMMERS and SHACKELS had arranged to deliver to Africa Country-1 for further transportation to the United States.  STAMMERS wrote, in part: "I just received the following on the two samples:  A - Whiter and in smaller granules B - Clear and bigger shards and harder to break. As per the boys, they are both very good and very strong, but they preferred B, even though it leaves a dirty track or base."

<u>April 2013</u>

## <u>STAMMERS and SHACKELS Seek to Procure Additional Samples of Methamphetamine for Supply to the United States</u>

s.   On or about April 13, 2013, STAMMERS sent an e-mail message to Individual-1; in the message:

i.   STAMMERS indicated that the CSes ("HQ") approved of the methamphetamine samples that had been supplied by REYES PERALTA, stating: "HQ likes both samples . . . and asked for prices and manufacturing quantities / capabilities."

ii.   STAMMERS sought to directly communicate with REYES PERALTA, the supplier of North Korean methamphetamine, whom Individual-1 previously had put SHACKELS in touch with; STAMMERS stated: "For the NK supplier, please can you advise how we can contact your supplier as he provided that sample, or will you cover this off and keep us posted."

iii. STAMMERS reported on a meeting between the CSes, STAMMERS, SHACKELS, and other individuals in which a potential partnership for narcotics distribution in "the Apple" was discussed.

t.   On or about April 15, 2013, STAMMERS sent an e-mail message to Individual-1 in which STAMMERS asked for "the address in Apple [New York] for HQ [the CSes], as I'm working on samples of glass [methamphetamine]".

### May 2013: Asian Country-1

### LIM and REYES PERALTA Agree to Supply 100 Kilograms of North Korean Methamphetamine to the United States

u.   On or about May 17, 2013, STAMMERS met with CS-1 and CS-2 in Asian Country-1; the meeting was audio- and video-recorded and, during the meeting:

i.   STAMMERS introduced CS-1 and CS-2 to ALEXANDER LNU, who described himself as the sergeant-at-arms of the "Outlaw Motorcycle Club" and a participant in the distribution of, among other things, methamphetamine.

ii.   CS-2 advised STAMMERS and ALEXANDER LNU that "one of our biggest markets is the States, that's no secret."

v.   On or about May 17, 2013, and May 18, 2013, LIM and REYES PERALTA met in Asian Country-1 with CS-1 and CS-2. The meetings were audio- and video-recorded and, during the meetings:

i.   LIM agreed to supply additional methamphetamine to CS-1 and CS-2 for $60,000 per kilogram.

ii.   LIM stated that he would supply CS-1 and CS-2 with 60 kilograms of methamphetamine as an initial transaction; REYES PERALTA confirmed: "It's going to be . . . sixty [kilograms of methamphetamine] at sixty [thousand dollars per kilogram]."

- 15 -

iii. LIM and REYES PERALTA then agreed to increase the initial transaction from 60 to 100 kilograms. REYES PERALTA stated: "My friends, can you do the sixty, a little bit, a little more, like one hundred if we're doing the same risk . . . ."; LIM added: "Yes, yes and, uh, I am more concerned because maybe after next year, my stuff will not last after next year."

iv.  LIM advised that his organization's stash of North Korean-manufactured methamphetamine had been relocated from North Korea to Asian Country-2: "North Korea, we cannot get things out from North Korea.  Only in [Asian Country-2] right now.  Because we already anticipated this thing would happen between America, Korea, North Korea, South Korea, Japan-- All the satellites are now--we cannot bring out our goods right now.  It's all in [Asian Country-2]."  LIM later advised that his organization had stockpiled one ton of North Korean methamphetamine in Asian Country-2.

v.  CS-2 requested that the 100 kilograms of methamphetamine be delivered somewhere outside Asian Country-2 because it had to be transported to the United States, stating: "Don't forget, we're going to the U.S. with the goods"; in response, LIM stated that he was considering Asian Country-1 as a possible methamphetamine trans-shipment point: "I was also

considering, considering to put it in a container run going to here, to [Asian Country-1]".

### July and August 2013: Asian Country-1

**LIM and REYES PERALTA Conduct a "Test Run" in Preparation for Shipping 100 Kilograms of North Korean Methamphetamine to the United States; STAMMERS, SHACKELS, and ALEXANDER LNU Agree to Provide Security**

w.   On or about July 15, 2013, in a telephone call with Individual-1, STAMMERS discussed the storage of 100 kilograms of methamphetamine destined for the CSes in the "Apple."

x.   On or about July 24, 2013, in a telephone call with Individual-1, SHACKELS discussed 100 kilograms of methamphetamine destined for the CSes in the "Apple."

y.   On or about August 1, 2013, after being asked to prepare a security and logistics plan for the shipment of 100 kilograms of methamphetamine, STAMMERS sent an e-mail message detailing, among other things, estimated costs, including payments for a "Ground Commander" to oversee "Security + counter-surveillance team + transportation + logistics + storage + re packing."

z.   On or about August 8, 2013, STAMMERS sent an e-mail message relating to a planned meeting in Asian Country-1, asking whether "our Deputy Ground Commander [should] attend the upcoming meeting as he will be able to assist briefing HQ [the

CSes] . . . ."; STAMMERS further wrote that "HQ [the CSes] has already meet A1 [ALEXANDER LNU] . . . ."

       aa.  On or about August 9, 2013, after LIM and REYES PERALTA had been asked to conduct a "dry run" shipment of innocuous goods "to test the system" to be used in shipping 100 kilograms of methamphetamine, REYES PERALTA sent an e-mail message attaching documents that demonstrated that approximately 4,700 kilograms of tea had successfully been sent. REYES PERALTA also provided information about a U.S.-dollar bank account to receive payment for the 100-kilogram shipment of methamphetamine, and asked to "divide payment into five transactions one transaction per day."

       bb.  On or about August 17, 2013, STAMMERS, SHACKELS, and ALEXANDER LNU met in Asian Country-1 with CS-1 and CS-2; the meeting was audio-and video-recorded and, during the meeting:

       i.  While ALEXANDER LNU was outside the room, STAMMERS explained how STAMMERS, SHACKELS, and ALEXANDER LNU could arrange for storage and security in Asian Country-1 for the 100-kilogram shipment of methamphetamine. STAMMERS proposed assembling a budget for the job and making ALEXANDER LNU the person principally responsible for the arrangements.

ii.   STAMMERS and SHACKELS agreed to provide
the CSes with information about the location where the
methamphetamine would be stored while in Asian Country-1.

iii. STAMMERS explained that he would sign
and seal the packages of methamphetamine to ensure no one
tampered with them.

iv.   STAMMERS explained that he and SHACKELS
would arrange for ALEXANDER LNU's associates to provide security
for the methamphetamine shipment.

v.    After ALEXANDER LNU returned to the
meeting, CS-1 explained that the 100 kilograms of
methamphetamine would be delivered to ALEXANDER LNU for storage
and counting, and then would be taken by boat "that will take it
to New York;" ALEXANDER LNU responded, "Got you, got you."

vi.   ALEXANDER LNU suggested that "we can
bring the sailboat directly into the marina" because an open-
water transfer of the 100 kilograms of methamphetamine would
risk discovery from a nearby United States military facility:
"the Americans are on the . . . base.  They have their eyes
everywhere."  STAMMERS further explained that the base "is the
U.S.'s biggest Naval base in the region."

vii. ALEXANDER LNU and STAMMERS explained
their plans for storing and transporting the methamphetamine,

- 19 -

including, among other things, proposing possible ruses to use when transferring the methamphetamine at sea.

> viii.    STAMMERS suggested staging a party on the yacht in the marina as a ruse to conceal the 100 kilograms of methamphetamine; ALEXANDER LNU suggested staging a photo shoot instead.

> ix.    ALEXANDER LNU confirmed that he had "done this before."

> x.    ALEXANDER LNU stated that there would be eight individuals "from my side" providing security for the 100 kilograms of methamphetamine.  In response to CS-2's question about what weapons the security team would use, STAMMERS stated: "We have our own weapons here, obviously." ALEXANDER LNU agreed, "Yeah, we have."

### September 2013

### Final Preparations for the 100-Kilogram Methamphetamine Shipment to the United States

> cc.  On or about September 4, 2013, STAMMERS sent an e-mail to Individual-1 stating, in part: "I have spoken with GC [the ground commander, ALEXANDER LNU] and we are going to need a tentative arrival date of the principal [methamphetamine shipment] . . ."; attached to the e-mail was an operational plan that included the location of the warehouse where the methamphetamine shipment would be stored.

- 20 -

dd.   On or about September 8, 2013, STAMMERS sent an e-mail to Individual-1 providing a revised security and logistics budget from "GC" (ALEXANDER LNU).

ee.   On or about September 23, 2013, LIM and REYES PERALTA traveled to Asian Country-1 to receive payment for the 100-kilogram shipment of methamphetamine.

ff.   On or about September 24, 2013, STAMMERS, SHACKELS, and ALEXANDER LNU traveled to a location in Asian Country-1 in order to receive funds for the security and logistics plan, and to receive final instructions about the shipment of methamphetamine.

(Title 21, United States Code, Sections 963, 959(a), 959(c), 960(a), and 960(b)(1)(H).)

## FORFEITURE ALLEGATION

14.   As a result of committing the controlled substance offense alleged in Count One, SCOTT STAMMERS, a/k/a "Shaun Simmons," a/k/a "S1," PHILIP SHACKELS, a/k/a "Paul Smith," a/k/a "P1," YE TIONG TAN LIM, a/k/a "Giorgio," a/k/a "Triad," ALLAN KELLY REYES PERALTA, a/k/a "Allan Kelly Peralta Reyes," a/k/a "Kelly," and ALEXANDER LNU, a/k/a "Alexander Checo," a/k/a "Alexander Semencov," a/k/a "A1," the defendants, shall forfeit to the United States, pursuant to Title 21, United States Code, Sections 853 and 970, any and all property constituting and derived from any proceeds that the defendants

obtained directly and indirectly as a result of the offense and any and all property used and intended to be used in any manner or part to commit and to facilitate the commission of the offense alleged in Count One, including but not limited to a sum of money representing the amount of proceeds obtained as a result of the offense described in Count One of this Indictment.

## Substitute Assets Provision

15.   If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendants:

      a.    cannot be located upon the exercise of due diligence;

      b.    has been transferred or sold to, or deposited with, a third party;

      c.    has been placed beyond the jurisdiction of the court;

      d.    has been substantially diminished in value; or

      e.    has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 21,

United States Code, Sections 853(p) and 970, to seek forfeiture
of any other property of the defendants up to the value of the
forfeitable property.

    (Title 21, United States Code, Sections 853 and 970.)


FOREPERSON   (deputy)

PREET BHARARA
United States Attorney



EXHIBIT A