G4SLSTAS                        Sentence

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          13 CR 579 (ALC)

5    SCOTT STAMMERS,

6                   Defendant.

7    ------------------------------x

8                                         New York, N.Y.
                                          April 28, 2016
9                                         11:34 a.m.

10

11   Before:

                   HON. ANDREW L. CARTER, JR.,
12
                                          District Judge
13

14                      APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     EMIL J. BOVE, III
17   MICHAEL LOCKARD
          Assistant United States Attorneys
18
     SEAN M. MAHER
19        Attorney for Defendant

20

21

22

23

24

25

1           (Case called)

2           MR. BOVE:  Good morning, your Honor.  Emil Bove and

3    Michael Lockard for the government.

4           MR. MAHER:  Good morning.  Sean Maher for

5    Mr. Stammers, who's sitting here next to me.  Good morning.

6           THE COURT:  Good morning.  Good morning, Mr. Stammers.

7           THE DEFENDANT:  Good morning, sir.

8           THE COURT:  We're here today to impose sentence in the

9    case of United States v. Scott Stammers.  In preparation for

10   today's proceeding I reviewed the presentence report.  I've

11   reviewed the submissions by the defense, as well as the

12   submissions by the government.

13          Is there anything else I should have, counsel?

14          MR. BOVE:  No, your Honor.

15          MR. MAHER:  No.

16          THE COURT:  Okay.  And I reviewed the proceeding

17   before Judge Cott and I accept the guilty plea and we will

18   continue.  Are both sides ready for sentencing today?

19          MR. BOVE:  Yes, Judge.

20          MR. MAHER:  Yes.

21          THE COURT:  And, Mr. Stammers, are you ready for

22   sentencing today?

23          THE DEFENDANT:  Yes, sir.

24          THE COURT:  Okay.  Defense counsel, have you reviewed

25   the presentence report with your client?  I know that you've

G4SLSTAS                        Sentence

1   read it because I've seen your objections to it, but have you

2   reviewed the presentence report with your client?

3              MR. MAHER:  Yes, I have.

4              THE COURT:  Mr. Stammers, have you had an opportunity

5   to review the presentence report with your attorney and discuss

6   any objections you might have?

7              THE DEFENDANT:  Yes, sir.

8              THE COURT:  Counsel for the government, have you also

9   reviewed the presentence report?

10             MR. BOVE:  Yes.

11             THE COURT:  Are there any objections to anything in

12  the presentence report by the government?

13             MR. BOVE:  No, your Honor.

14             THE COURT:  Although I am no longer required to

15  strictly adhere to the sentence guidelines, I am still required

16  to consider the applicable guidelines in imposing sentence, and

17  to do so it's necessary that we accurately calculate the

18  sentencing guideline range.  So we need to turn to several of

19  the objections raised by the defense regarding the guidelines.

20             I also note there were some other objections indicated

21  in the presentence report, objections that the defendant had

22  aside from the guideline calculation.  It seems that all of

23  those other objections are incorporated in the current report,

24  but correct me if I'm incorrect about that, counsel?

25             MR. MAHER:  You're correct.  Some of the factual

1    objections that I made, there has been basically a bracketed

2    sentence added.  But our position is -- and then my further

3    objection was that the entire position be the position of the

4    paragraph.  That is the only remaining issue for those types of

5    paragraphs.

6            THE COURT:  Okay.  Let's turn to the guideline

7    calculation.  Let's turn to the special offense characteristic.

8    Pursuant to 2D1.1(b)(5), because the offense involved the

9    importation of amphetamine and the defendant is not subject to

10   an adjustment under 3B1.2 for mitigating role, the offense

11   level is increased by two levels.

12           I've read the submissions.  Let me hear briefly from

13   the defense anything else you want to add.

14           MR. MAHER:  No, your Honor.  You've heard the full

15   argument by codefendant Valkovic, which I have incorporated by

16   reference.  I also adopt the arguments made by codefendant

17   Peralta, which I think were a little bit different but similar.

18   And I think the issue is clear before the Court.  Our position

19   regarding the importation is because it was basically inchoate,

20   he shouldn't be assessed the levels.

21           THE COURT:  Anything else from the government on this?

22           MR. BOVE:  Just with respect to that point that was

23   just made by counsel, your Honor, I think that we're all

24   directed by binding precedent to presume that the author of

25   these enhancements meant what they said and crafted them

1  intentionally.  And so when you look at the (b)(5) enhancement,

2  as your Honor has ruled previously, it speaks to the offense in

3  general.  And here, although it's true that it's an inchoate

4  offense, a feature of that offense was in fact to import

5  methamphetamine.  Moreover, as the probation office has

6  reasoned, methamphetamine was in fact imported as a result of

7  this offense.

8          I think the point is really made in reference to the

9  (b)(3) enhancement which reads, if the defendant unlawfully

10  imported, and so that's a place where the guidelines are

11  structured to actually look for an actual importation as

12  opposed to this one which does not require that act.

13          So for all those reasons, we think your Honor has

14  ruled correctly in the past and should rule again in this case

15  that the enhancement applies.

16          THE COURT:  I find that the enhancement applies.

17  Again, the word "involving" has expansive connotations and I

18  think it must be construed as extending the focus of that

19  section beyond just those particular crimes that are listed

20  there because it does use the word involved or some form of the

21  word involved there.  And I think that expansive reading of it

22  is appropriate and I find support in the Supreme Court's

23  analysis in *Taylor*, which contrasted definitions using the word

24  involving with definitions that did not include that word.  So

25  I do find that that enhancement does in fact apply.

1              Next objection for the role in the offense.  And,

2    again, I guess I need to add as part of that enhancement

3    applying, it's also necessary to find that the mitigating role

4    adjustment is not appropriate.  Let me just hear from defense

5    counsel, is there anything else you want to add regarding

6    mitigating role here?  I know that you take the position that

7    he should be considered a minor participant and that the

8    aggravating role should not apply.  Is there anything else you

9    want to add regarding role here in terms of mitigating role

10   here?

11             MR. MAHER:  I guess it really doesn't matter how we

12   parse it -- it's the same argument.  Really understanding what

13   Mr. Stammers' role is is the same factual discussion by me

14   either way your Honor wants to look at it.  So I can discuss it

15   now and it would carry over to whether it's aggravating or not

16   based on how you assess what that is.

17             THE COURT:  Well, those distinctions do actually make

18   somewhat of a difference.  Obviously, if you're looking for a

19   mitigating role, that would be your burden for that sort of

20   mitigating role to get that.  It's the government's burden for

21   the enhancement, for the enhanced role as a manager.

22             I'll let you know what my thinking is based on what

23   I've seen in the presentence report.  It seems to me that a

24   minor role is not appropriate.  I'm not sure if a managerial

25   role is appropriate, but it seems pretty clear that he's not a

G4SLSTAS                      Sentence

minor participant.  I understand your argument that there was

someone else above him who was directing him, but that

certainly doesn't make him a minor participant.

          But if you prefer, let's just talk about his role now.

And I just want to make sure we understand that I'm clear that

I understand that the burdens are different depending on which

way we're going here.  In terms of asking for a mitigating

role, that's your burden.  For the aggravating role, that's the

government's burden.

          MR. MAHER:  Exactly.  I wasn't suggesting in any way

conflating those.  I was merely discussing the best way just to

talk about these issues.

          THE COURT:  Okay.  Go ahead, counsel.

          MR. MAHER:  This has been in many ways a very

difficult case to defend and one of the difficulties has really

been really understanding what it was about and it's something

that your Honor knows that we've grappled with as we've gone

through extensive discovery and had the time that your Honor

granted us to go through this and the supplemental discovery

requests that I've made to get more information, particularly

about Paul Le Roux, who was the government's cooperating

witness in this case.  And now as we get towards the

culmination of everything, I think the lens has revealed things

much clearer as to what the quote/unquote organization is that

the government has been talking about for all of these months.

G4SLSTAS                        Sentence

1           The government talks about the organization and they

2      raised it again in their surreply yesterday.  I submit that

3      there was no organization per se.  What you have is you have a

4      brilliant murderous manipulator, Paul Le Roux, who has for

5      years now been engineering and overseeing his own wave of crime

6      across the globe.  And it is breathtaking the scope of the

7      activities that Le Roux has been involved in ranging from

8      arming militias in Somalia to potential land grabs in Zimbabwe

9      to vast pharmaceutical drug importation or sales schemes in the

10     United States and Israel to what we know now from the sealed

11     information which has now been confirmed on March 19 of this

12     year, just about a month and a half ago, it looks like the

13     government unsealed the information that Mr. Le Roux has

14     pleaded guilty to.  And in that it appears that he has pleaded

15     guilty to a count that incorporates the facts of his

16     involvement in five murders and two more conspiracy to commit

17     murders.

18           So there is an aspect of this case which I think can't

19     be discounted that Paul Le Roux was in charge of everything and

20     he highly compartmentalized what people did and knew.  You can

21     see that just from looking at the discovery and the indictments

22     in these various cases that the government helped orchestrate.

23     They had the meetings with the Hunter group in the same place

24     in a different country and Mr. Stammers had no idea that that

25     was even going on, just like Mr. Stammers has never met Tan Lim

G4SLSTAS                          Sentence

or never met Peralta.  It was highly compartmentalized by Le

Roux.

             And Le Roux made it known to people once they got

within his orbit that he did not brook dissent and that any

type of double dealing or anything that didn't go his way could

be met with death.  And we're not raising that as a defense.

Mr. Stammers has openly pleaded guilty to the counts.  There's

been no plea agreement.  There's been no cooperation.  It's one

man acknowledging his mistake and his criminal activity that he

did agree to help Le Roux with the hundred kilogram meth

potential sale and distribution, though Mr. Stammers was not

involved in the sale aspect, merely the transportation and some

part of the safeguarding of it.

             But Mr. Stammers' role in all this was really, and I

don't want to use this too pejoratively, but almost as an

errand boy for Le Roux.  Le Roux gave specific instructions to

Mr. Stammers about how he wanted something done.  Mr. Stammers

was not a part of some large organization where he had a crew

working under him that was part of some criminal conspiracy.

We've seen how the U.S. Attorney's Office when they take down

the mob or a faction of the mob, they'll have their

organizational chart and they'll have their mafia leader at the

top and then they'll have their capos and their soldiers and

have their big display of all these members and this clear

delineation of authority.  There's been none of that in this

G4SLSTAS                    Sentence

1    case and it's clear why -- because there was none.

2            There was Le Roux at the top, who the government has

3    denied and denied.  And then he had in this case for this

4    indictment four other people who were working in two groups in

5    isolation, basically, from each other, except for when Le Roux

6    had them contacting each other.

7            Mr. Stammers and Mr. Shackels, who if anything were

8    coequals under Le Roux, were on their aspect of things, and Tan

9    Lim and Peralta were on their aspect of things and that was it.

10   Anything that Mr. Stammers said he was going to do as far as

11   logistics was contacting regular people to organize things.  It

12   was not that he was directing criminal surrogates of Le Roux to

13   carry out the criminal activity directed by an organization.

14   So I think that that goes not only to the minor role.  When you

15   look at Le Roux's totality of his criminal behavior, Scott

16   Stammers' assistance to Le Roux is very, very, very small, very

17   small indeed.  So that is the crux of our minor role.

18           But transitioning to the managerial aspect or

19   supervisory, I think it just flies in the face of the

20   guidelines to ascribe that type of level of authority and

21   decision-making to Mr. Stammers.  He simply didn't have it.

22   Anything that had any type of real decision-making had to be

23   run through Le Roux and with the caveat that if it wasn't done

24   that way properly, there was always in the back of one's mind

25   what could happen, who could disappear -- yourself, a family

member, who else -- if it didn't get carried out.

And we have not raised a specific motion about this,
but I think it's a factor to take into account at sentencing,
the government's use of Le Roux in this context, a man who is
known to people close to him as assassinating people who don't
carry out his orders, as someone that the government then is
using to direct people to conduct criminal activity.  That's a
very different thing than if the government came across
Mr. Stammers, who is with an organized group of people and they
were involved in a long running operation to import
methamphetamine into the United States, which Mr. Stammers had
never, he never had any contact with importing any type of
drugs into the United States until Le Roux, working for the
government, suggested it and then directed it.

So that's not, again, to in any way limit
Mr. Stammers' full acknowledgment of guilt.  He agreed to it
and he knows that it's a mistake and I'll talk about that when
we address the 3553 factors, but I think it is a reality of
this case that needs to be acknowledged.

In a nutshell, those are my arguments as far as
Mr. Stammers' role.  Mr. Stammers had a legitimate job with a
legitimate security firm.  He was approached by Dave Smith,
okay.  It wasn't that Mr. Stammers had an illegal job that was
working on behalf of Mr. Le Roux.  Mr. Stammers was basically
recruited by a man named Dave Smith to start getting involved

1    in activity that was outside of his normal scope of employment.

2    Dave Smith was the go-between between Mr. Stammers and Mr. Le

3    Roux until one day Dave Smith disappeared, and now we believe

4    that he disappeared under direction of Paul Le Roux that he be

5    murdered.  At that point, Mr. Stammers began to have direct,

6    without Mr. Smith filtering or being present, having direct

7    contact with Le Roux.  So that was the nature of his contact

8    with Le Roux and how he got to be brought into this.

9            THE COURT:  Okay.  I have a few questions then.

10   What's important in 3B1.1 and 3B1.2 is a comparison between

11   Mr. Stammers and another or other participants.  So for 3B1.2,

12   for the mitigating role adjustment that you're seeking, in the

13   application notes, application note 3A indicates that this

14   section provides a range of adjustments for a defendant who

15   plays a part in committing the offense that makes him

16   substantially less culpable than the average participant in the

17   criminal activity.

18           Your arguments imply to me that what you are saying is

19   that this organization didn't have a multilayered hierarchy,

20   that essentially there was Mr. Le Roux at the top and then

21   everyone else was sort of on the same plane below him, and if

22   that is the case, if that is your argument, then that does not

23   make Mr. Stammers substantially less culpable than the average

24   participant.  Your argument makes him the average participant.

25   The way I'm listening to your argument is that Mr. Le Roux is

1    the super participant and everyone else is below him on the

2    same level, and if that's the case, it seems to me that the

3    mitigating role adjustment cannot apply in that situation.

4            MR. MAHER:  That's not exactly my argument, but I

5    think it still could even with what you're outlining there,

6    your Honor, if the criminal activity is really generated by Le

7    Roux and what he's basically doing is outsourcing specific acts

8    that he wants done to specific people, okay -- Mr. Stammers had

9    nothing to do with Tan Lim, nothing.  One can argue that Tan

10   Lim's role when one looks at this was substantially higher than

11   Mr. Stammers.  Tan Lim was the one who it appears from the

12   discovery that he was posturing that he could get the hundred

13   kilograms of pure methamphetamine from North Korea.

14           THE COURT:  Before you go on, just so I'm clear and

15   we're working on the same page here, a participant for 3B1.1

16   and 3B1.2 does not need to be someone who was convicted of the

17   crime.  I'm not certain if he actually needs to be someone who

18   was listed in the indictment.  I don't believe that's

19   necessary.  He just has to be a participant in the criminal

20   activity.

21           Now, we need to -- you're identifying people who have

22   been convicted of this crime.  You're identifying other folks.

23   That's fine.  But in terms of the average participant in this

24   criminal activity, in this organization, how is it that

25   Mr. Stammers is substantially less culpable than the average

G4SLSTAS                        Sentence

1    participant?

2            MR. MAHER:  Who is an average person?  We have no

3    organizational chart.  It's an analysis that kind of falls

4    apart in this situation because, again, Mr. Le Roux is

5    basically hand picking people around the globe and he's got

6    legitimate businesses where he has people running what look

7    like legitimate businesses.  And then he has some that were

8    illegitimate.  Then he's got a lot of gray in between and

9    there's people that he recruits and that he doesn't.

10           That's why I started talking about how broad it is.

11   If you're looking at the criminal enterprise or organization,

12   on one hand you could say you have Le Roux and you have

13   something going all the way back to his operations in Somalia,

14   all right.  And if you look at from Somalia to Israel to Brazil

15   to Colombia to Thailand to the Philippines, Mr. Stammers

16   absolutely is microscopic compared to the average participant

17   in all of that.  Mr. Stammers was not studying up

18   hallucinogenic drug chemical laboratories in Somalia.  He

19   wasn't doing anything like that.

20           It depends on the scope as you want to look at this.

21   If you want to drill down to just this indictment and people

22   who were involved in this indictment, it's important to note

23   that nothing happened.  There was no importation.  And most

24   likely there never was any methamphetamine ever made in North

25   Korea that was ever going to be distributed in this case, none.

G4SLSTAS                        Sentence

It was purely an idea of the government to put the carrot out

there and to use Le Roux to help make sure that the carrot got

bit.

So if you look at Mr. Stammers in comparison to Tan

Lim, you can make the argument that his purported role in this

conspiracy was much less than Tan Lim's because he had no

involvement in the production or the sale back and forth of

large quantities of methamphetamine like Tan Lim.  He wasn't a

part of any Hong Kong network, okay, which the government seems

to be delineating apart from "the organization of Le Roux."  So

as far as that, I think he's much less culpable and that is

enough to say that he should be worthy of minor role.

THE COURT:  Okay.  Since you suggested we talk about

role at one time, let's do that.  Let me hear you about

aggravating role.  And also let me just, again, I've read the

submissions.  I think I understand your position regarding

aggravated role, but I want to make sure I alert you to 3B1.1,

aggravating role.  The application notes, application note 2,

says that to qualify for an adjustment under this section, the

defendant must have been the organizer, leader, manager, or

supervisor of one or more other participants.  Then that next

sentence says, an upward departure may be warranted, however,

in the case of a defendant who did not organize, lead, manage,

or supervise another participant, but who nevertheless

exercised management responsibility over the property, assets,

G4SLSTAS                      Sentence

1    or activities of a criminal organization.

2           So I just want to make sure that you're aware of that.

3    It seems that that might apply.  I'm not saying that it does or

4    doesn't, that upward departure that's listed in the application

5    note.  But I have an obligation under Second Circuit precedent

6    to let you know that I am contemplating that.  I haven't

7    decided whether that applies, but I'm contemplating potentially

8    that upward departure.

9           So now that I've let you know that, I also have an

10   obligation to give you an opportunity if you'd like to seek an

11   adjournment for either side if you want an adjournment to think

12   about that some more.

13          So, counsel, do you want an adjournment to consider

14   that?

15          MR. MAHER:  May I have a moment to talk with

16   Mr. Stammers?

17          THE COURT:  Sure.

18          (Defendant and counsel conferring)

19          MR. MAHER:  We're ready to proceed, your Honor.  I've

20   discussed it with Mr. Stammers, and he would like to continue.

21          THE COURT:  Okay.  So, Mr. Stammers, you'd like to

22   continue?

23          THE DEFENDANT:  Yes, sir.

24          THE COURT:  Counsel for the government, would you like

25   an adjournment to consider this contemplated upward departure?

G4SLSTAS                          Sentence

1          MR. BOVE:  No, your Honor.  We're prepared to proceed.

2          THE COURT:  So I just wanted to alert counsel of that.

3    Let me hear from defense counsel regarding the aggravating role

4    adjustment.  I will share with you I am, again, what's

5    necessary for 3B1.1 and 3B1.2 is identifying participants.  For

6    the 3B1.2, it's necessary to try to get a sense of the average

7    participant.  For 3B1.1, it's necessary to be able to identify

8    a participant that Mr. Stammers was potentially managing in

9    this case, and I'm not sure whether that has been done.  I am

10   inclined not to give the enhancement for aggravating role

11   because I'm not sure.  I'll hear from the government more on

12   that.  Obviously, that's their burden in terms of which

13   participant is being managed in this case.  And, again, the

14   participant doesn't have to be someone who has been convicted

15   of this crime.

16         But go ahead, counsel.  Let me hear from you or should

17   I turn to the government now regarding the aggravating role

18   adjustment since that's their burden?

19         MR. MAHER:  I prefer that.

20         THE COURT:  Okay.  Let me hear from the government

21   regarding, first, let me give the government a chance to

22   respond to what defense counsel has said about the minor role

23   adjustment.

24         MR. BOVE:  Judge, I think it's all appropriately

25   wrapped up into one piece at this point because our position is

1    that the aggravating role adjustment, the three-level

2    adjustment is appropriate, although we take your point.  In the

3    alternative, it may be the case that an upward departure is

4    appropriate.

5          Judge, there was an organization in this case.  There

6    was methamphetamine in this case, and this defendant managed

7    that organization.  Let me start with the first point.

8          However criminally culpable Paul Le Roux is, and

9    counsel has gone to great lengths today to describe that,

10    that's not a mitigating feature for the man sitting behind me

11    because this is one of his right-hand men, one of his principal

12    managers, somebody who is tasked with running day-to-day

13    operations on the ground for, among other things, which I think

14    we'll get to when we talk about the 3553 factors, the

15    methamphetamine shipment in question.

16          The defendant in this case, I think one of the unique

17    features is that most of the most relevant incriminating

18    evidence are literally his email communications.  Your Honor

19    can see in his own words exactly how he was managing the

20    organization and that the organization did in fact have a

21    structure.

22          Your Honor has seen from our submission the defendant

23    referred to the organization's "banker boys."  He's referred to

24    the couriers.  The defendant literally wrote the operational

25    plan for this methamphetamine shipment that's at issue in the

G4SLSTAS                    Sentence

1    conspiracy conviction and that's attached to our submission as

2    Government Exhibit C.  And here on page 2, it refers to a

3    covert counterambush team.  That's another part of the

4    structure of this organization.  Another feature is Valkovic,

5    the codefendant in this case, who brought to the table a

6    motorcycle gang providing security in this case.

7           So there was an organization.  The defendant has been

8    caught in his own words on email referring to the company.  And

9    the defendant was the one managing it for Paul Le Roux before

10   Paul Le Roux was arrested and after Paul Le Roux was arrested

11   in this case.

12          As I said, and this is in response to one of counsel's

13   points about whether or not there was methamphetamine at issue

14   to be managed, there are literally photographs of that

15   methamphetamine in our submission at I believe pages 8 and 14.

16   There were the kilograms that were seized, and then there's the

17   samples that were sent.  And this defendant, your Honor, was

18   responsible for managing both the stash that was seized and for

19   managing the samples that were sent in furtherance of the

20   100 kilo transaction.

21          Now, I think getting to your Honor's point about

22   whether the defendant had managerial responsibility, and if so,

23   who was a participant that he managed, your Honor can see from,

24   again, his email communications, including the one that's

25   attached as Exhibit B, there was a ground commander that the

G4SLSTAS                          Sentence

1    defendant managed.  There was a political asset that the

2    defendant managed.  We argue that the defendant was also

3    responsible for managing and exercising discretion over not

4    only Valkovic, but certainly the I'll call them foot soldiers

5    or other security members that Valkovic was to provide in

6    furtherance of this shipment.

7         So in all of those respects, your Honor, I think

8    there's an ample basis for finding that there were people that

9    he managed.  How did he manage them, your Honor?  Your Honor

10   can see, again, from the emails in the submission he talks

11   about having negotiated -- that's his word -- a downward price

12   adjustment for the transportation of the methamphetamine.

13        And, again, because I think it does bear repeating

14   with respect to whether or not he's exercising discretion and

15   how he's operating this, he sends Mr. Le Roux a series of

16   questions that illustrate that he's thinking carefully about

17   how to conduct this crime in a sophisticated way.  That's

18   Government Exhibit B to the memorandum.  And then, again, he

19   designs the op plan.  And the op plan -- I know your Honor has

20   reviewed it -- is sophisticated and it reflects, again, careful

21   thought and coordination with a number of people who were going

22   to be responsible for the logistical operations when the

23   methamphetamine got there.

24        I'll close by saying that even in counsel's

25   presentation, and I understand it was with respect to the

G4SLSTAS                    Sentence

1    mitigating role adjustment, he used verbs like organized.  The

2    defendant organized, Mr. Le Roux outsourced his projects.  We

3    agree with that terminology.  That's what the defendant did

4    here.  He organized a team to receive and distribute a 100

5    kilogram shipment of methamphetamine that he understood was

6    going to be imported into the United States.  He did that by

7    directing a number of people.  And so we feel that the

8    three level adjustment is appropriate, and if not that, your

9    Honor, certainly both an upward departure on the basis your

10   Honor has described, as well as aggravating considerations

11   under 3553 should all be taken into account.

12        THE COURT:  Okay.  And what about the fact that from

13   what I've seen in the presentence report, it's certainly

14   implied that Mr. Stammers was involved with Mr. Le Roux prior

15   to Mr. Le Roux's association with law enforcement in this case.

16   How is it that I should discern whether or not these

17   individuals who he's communicating with and speaking to -- at

18   one point in your submission you said he was recruiting

19   individuals to participate in this activity.  How am I to

20   discern since Mr. Stammers was involved with Mr. Le Roux before

21   his association with the government whether or not these are

22   individuals that Mr. Stammers had recruited and was sort of

23   managing sort of interdependently with Mr. Le Roux as opposed

24   to longer standing members of this organization or longer

25   standing people who were affiliated with Mr. Le Roux who might

G4SLSTAS                    Sentence

1    have been more in a cooperative situation with Mr. Stammers as

2    opposed to sort of Mr. Stammers managing them and these people

3    perhaps being very eager and perhaps maybe reaching out to Le

4    Roux to reach out through him.  Tell me more about that.

5            MR. BOVE:  Your Honor, for the recruitment point,

6    these are the emails that we highlighted from late 2012.  It's

7    frankly not clear to us exactly when Mr. Stammers is referring

8    to this North Korean asset that we're referring to on page 5 of

9    our submission.  Certainly the fact that this person needs to

10   be vetted and the last line of the email says, please let me

11   know once vetting has been completed, illustrates to us, the

12   government, that even in October of 2012, Mr. Stammers was

13   working to recruit other people on behalf of the organization.

14           But I think more directly to your Honor's point,

15   whether or not there were people who were preexisting members

16   of the organization, they were recruited by Mr. Stammers to

17   participate in this specific shipment.  Your Honor can see from

18   the email traffic that there were a number of pending ventures,

19   both drug trafficking and weapons related, and what

20   Mr. Stammers did here was identify a series of people who in

21   turn had employees working for them who could facilitate the

22   maritime receipt of this load and then the transportation of it

23   once it arrived.

24           And I think to maybe put a finer point on it by way of

25   example, your Honor, the email communications about the

1    political asset illustrate that initially Mr. Stammers wasn't

2    sure who exactly that was going to be.  And ultimately by the

3    end of it, it sounds from these emails like he had identified

4    that person because he refers to having actually met with them.

5    So that is one example of a person, we submit, who was directly

6    recruited by Mr. Stammers to facilitate this particular

7    offense.

8            THE COURT:  Okay.  And let me hear from you a little

9    bit more regarding the potential upward departure because it

10   does seem to me based on what I've seen that even if

11   Mr. Stammers didn't organize, lead, manage, or supervise

12   another participant, he has exercised management responsibility

13   over the property or assets of this criminal organization since

14   he seemed to be in charge of storing large quantities of the

15   drugs involved in this case.  Anything to add on that?

16           MR. BOVE:  I think your Honor is correct in drawing

17   that inference.  There's an email in our submission that

18   illustrates that Mr. Stammers actually identified to Le Roux

19   the FedEx shipments that were used to transmit the samples.

20   That's one aspect of the property that I think almost

21   undisputedly or certainly not subject to reasonable dispute

22   that Mr. Stammers managed.  But, again, the government's

23   position is that those larger seizures of methamphetamine were

24   also part of the property of the organization, the contraband

25   that Mr. Stammers helped to manage.  And I think you can also

G4SLSTAS                         Sentence

see he's talking about managing the finances when he refers to

the banker boys and the transfers to avoid links to company

personnel.  So I think there's, as your Honor is suggesting

here, an ample basis for certainly that departure, the upward

departure.

          But I do believe there is a basis here for a finding

that there are specific participants, including Valkovic,

including the people under Valkovic, including the ground

commander referenced in the evidence, as well as the political

asset, and also this covert counterambush team, all of whom

Mr. Stammers took on the responsibility of both identifying for

support of this operation and then carrying it out.  And the

man at the table here behind me was managing all of that,

however culpable Paul Le Roux was in this.

          THE COURT:  Okay.  Thank you.  Let me hear from

defense counsel now.

          MR. MAHER:  From my perspective, this is an ongoing

problem with the reliability of what the government asserts

throughout this case.  The government again brings up the

ground commander, all right.  We discovered in the

submission -- and I filed this letter two days ago -- that the

government cut and pasted an email to make it look -- and I'm

not saying they intentionally did it at this point, but they

cut and pasted an email that was then interpreted by the

government that Mr. Shackels gave directives about this ground

G4SLSTAS                          Sentence

1  commander.

2          And the defense found the original discovery page.  We

3  provided it to the Court.  It's in our submission.  And it's

4  clear from that page, it's unfathomable how any lawyer could

5  look at that page and cut and paste and then make the arguments

6  that the government made.  It's unfathomable.  And, again, I'm

7  not suggesting that it was intentional.  But to miss something

8  that big is troubling.  And I think that that goes to the

9  reliability of what the government is trying to present here

10  about Mr. Stammers.

11          The government just now talked about all of these

12  different crews.  Let's name one, name one.  How can the

13  government show that this isn't bluster on Mr. Stammers' part,

14  that there was ever going to be any actual transportation at

15  all?  There's not one quote/unquote banker boy that the

16  government has one email from Mr. Stammers, one phone call, one

17  surveillance photo, nothing, no contact that Mr. Stammers has

18  with some type of banker boy or courier, none, because they

19  didn't exist.

20          There is no covert ambush team to speak of.  Sure,

21  it's in a piece of paper.  Does that mean it actually existed

22  or there are actual people?  No.  The government does not have

23  one email, one phone call, one wiretap, one photograph,

24  anything of anyone of some supposed covert ambush team because

25  it doesn't exist.  There was none.

1            There were no people that Mr. Stammers is pulling the

2      strings of as the government is suggesting right now.  And it's

3      because the government is trying to piece together emails which

4      have ambiguous terms and also have puffery involved to try to

5      then inflate Mr. Stammers' role.  And it's been done explicitly

6      in the wrong way, like I suggested how they cut and pasted an

7      email, right, to more subtle how the government views things

8      where a reasonable person could absolutely not agree with the

9      government's take on things.

10           And if it's their burden now, the government utterly

11     fails to show that Mr. Stammers was supervising and managing

12     people to the extent that he deserves any type of aggravating

13     role assessment or upward departure.  And the upward departure

14     is clear.  In the beginning of the sentence it says the Court

15     may.  This is not a mandatory provision.  This is a may.  And I

16     don't think that the totality of the facts here are one that

17     should persuade the Court to invoke that type of discretion

18     here.

19           The government brings up that there was

20     methamphetamine in this case and they bring up the 30 kilogram

21     shipment.  And Mr. Stammers, and I have been clear, was not

22     involved in that 30 kilogram shipment.  He was not.  And there

23     is a division between Mr. Shackels and Mr. Stammers regarding

24     that.  Mr. Stammers was not involved in bringing that 30

25     kilogram shipment.  He didn't find out about it until after it

was seized by the authorities.  That's when he was basically

recruited to help do damage control about it, but that was not

his baby, okay, not at all.  And the government has been trying

to portray this picture that Mr. Stammers was involved in that

and he wasn't.

Likewise with the sample, the 2 gram sample of

methamphetamine, that was not organized by Mr. Stammers.  He

came to have knowledge of it, but he was not organizing that.

And the tracking number, that email tracking number,

the email that contains the tracking number that the government

is trying to get mileage out of, that was directed from Le

Roux, get me the tracking number.  And the reason Le Roux sent

that email to Mr. Stammers was because Shackels was in charge

of that and Le Roux was trying to get Shackels to type

something up, a response that he could then forward to his FBI

or DEA handler about this.  Shackels was not responding to Le

Roux quick enough and so that's why Le Roux then got on

Mr. Stammers, I need the tracking number, get it for me.  So

Mr. Stammers, because he's being directed by Le Roux, asks

Shackels, hey, what's this tracking number boss wants and then

forwards it.  That's this email about the tracking number.

This does not indicate that Mr. Stammers was the

mastermind behind the importation and the dry run.  It is what

it is.  Mr. Stammers was working at Le Roux's behest, but was

not in charge of that aspect and was not managing Phil

G4SLSTAS                        Sentence

1    Shackels.  He was not managing Valkovic.  Okay.

2            The bottom line, it's just not right.  It's just not

3    right to ascribe this to Mr. Stammers.  The government talks

4    about negotiating deals and the example that they give is

5    Mr. Stammers saying that he negotiated a drop in price.  Well,

6    darn, I mean that's a lot of discretion to get a better price

7    for your boss who might assassinate you if you do the wrong

8    thing.  There's nothing to suggest that Mr. Stammers said, hey,

9    boss, I know you said you'd only spend $10 million on this.  I

10   just agreed that you'd spend 20 million on it.

11           THE COURT:  Okay.  Let me do this.  Let me let the

12   parties know what my thinking is.  I am at this point not

13   inclined to grant the mitigating role adjustment that the

14   defense is requesting, nor am I inclined to grant the

15   aggravating role adjustment that the government is requesting.

16   I have not yet decided about upward departure yet because I

17   first need to -- I am required to determine the guideline range

18   first that applies before I look to any departures upward,

19   downward, or any of the other factors in 3553(a).

20           That's where I'm leaning.  But both sides have an

21   opportunity, if you wish, we can have a sentencing hearing

22   about that.  Does either side request a Fatico or other styled

23   sentencing hearing in this case to address these issues or

24   anything else, an evidentiary hearing?  Let me hear from the

25   defense.  Do you seek one?

G4SLSTAS                        Sentence

1          (Defendant and counsel conferring)

2          MR. MAHER:  Your Honor, Mr. Stammers is prepared to go

3    forward today.  And we're prepared for your Honor to make the

4    appropriate decision about this, but our position is very clear

5    that he was not involved in that 30 kilograms.

6          THE COURT:  Okay.

7          MR. MAHER:  As far as, if I could just finish the last

8    sentence of my negotiation argument that I was making, that

9    Mr. Stammers was not authorized to do anything beyond the

10   bounds that Le Roux directed him to.  To actually show

11   independence in negotiating, he didn't have that.

12         THE COURT:  Okay.  So just to be clear, you do not

13   seek any sort of evidentiary hearing.

14         MR. MAHER:  That's correct.

15         THE COURT:  Okay.  Government.

16         MR. BOVE:  The government is not seeking an

17   evidentiary hearing either, your Honor.  We believe that the

18   defendant's statements as summarized in the submission and at

19   times quoted speak for themselves.

20          I'm frankly a little confused.  On the one hand, I

21   hear Mr. Maher saying that the defendant now should not be

22   taken at his word, that some of these emails are puffery, that

23   this is not enough to prove that he actually did these things.

24   But on the other hand, I hear Mr. Maher saying that Paul Le

25   Roux was such a dangerous, violent individual that of course

G4SLSTAS                      Sentence

1    Mr. Stammers would do whatever he said.

2            And so it's doubtful to say the least that a man who

3    crafted the operational plan that your Honor has now read to

4    receive this shipment actually didn't do any of those things to

5    coordinate the receipt of that shipment and intended to just

6    dump those drugs in the ocean when they arrived at the intended

7    location because he certainly understood that they were coming,

8    which is clear from his guilty plea in this case.

9            THE COURT:  Thank you.

10           MR. MAHER:  I just want to say that's the crux of the

11   government's argument -- we think so.  That's it.  We think so.

12   No proof, just we think so.

13           THE COURT:  Okay.  I am not going to grant the defense

14   request for a mitigating role.  So, again, under paragraph 71,

15   that special offense characteristic pursuant to 2D1.1(b)(5),

16   two-level enhancement does in fact apply because Mr. Stammers

17   is not subject to an adjustment under 3B1.2.

18           Under paragraph 73, the adjustment for role in the

19   offense, I will not apply that adjustment that the government

20   has sought and it's listed in the presentence report.

21           So we are at a base offense level of 38, with an

22   additional two points pursuant to 2D1.1(b)(5), which gives us

23   an adjusted offense level of 40, minus three points for

24   acceptance of responsibility under paragraph 77 and 78

25   combined, which takes us to a total offense level of 37.

G4SLSTAS                     Sentence

1      I don't believe there are any other objections by

2 either side to any of the guideline calculation, is that

3 correct, defense counsel?

4           MR. MAHER:  Nothing further, no.

5           THE COURT:  Is that correct, counsel for the

6 government?

7           MR. BOVE:  That's correct, Judge.

8           THE COURT:  Other than what's already been stated, is

9 there any objection to my guideline calculation from the

10 defense or the government?

11           MR. MAHER:  None that I have not already otherwise

12 raised.

13           MR. BOVE:  No, your Honor.

14           THE COURT:  All right.  So I find that the total

15 offense level is 37, and both sides are in agreement that

16 Mr. Stammers is in criminal history category I, which gives us

17 a guideline range of 210 to 262 months.

18      I will now hear from the parties regarding any other

19 issues they wish to raise about the appropriate sentence in

20 this case starting with counsel for the defense.

21           MR. MAHER:  Thank you, your Honor.  I just have a

22 second of two just to set up here.

23      Thank you, your Honor.  I'm ready if you are.

24           THE COURT:  Okay.

25           MR. MAHER:  And I take it I can address the 3553

1    factors at this point.

2              THE COURT:  Yes.  Anything relevant to sentencing at

3    this point, yes.  I've already determined the guideline range,

4    so, yes, the 3553 factors, any request for a downward departure

5    or the like.

6              MR. MAHER:  Thank you.

7              THE COURT:  Or any further things you want to say

8    about my notice of the upward departure as well, but I think

9    we've already heard all of that.  Whatever you wish to raise,

10    counsel, go ahead.

11             MR. MAHER:  I appreciate the opportunity.  Thank you,

12    your Honor.

13             This is a sad day for Mr. Stammers, but in other ways,

14    it's also I think a hopeful day for Mr. Stammers.  In our

15    sentencing memorandum, I described Mr. Stammers' life history,

16    I believe, and I am not going to go into the detail that I did

17    in my written submission in public and part of that is because

18    Mr. Stammers is a very reserved, private person, particularly

19    when it comes to his family.

20             But I think one thing is clear from the information

21    that the Court has before you is that Mr. Stammers' childhood

22    was difficult.  To be a nine-year-old boy and basically have to

23    decide which parent you choose and your sister being given the

24    same decision and then a unit of four being divided down the

25    middle is tragic and that has reverberated throughout

1  Mr. Stammers' life and it's reverberated through his ability

2  and inability for many years to have a stable relationship with

3  another person, to his use of substances in order to mitigate

4  feelings of hurt and emptiness that he has had.

5       Mr. Stammers was basically, as you know, raised by his

6  father, living in Hong Kong.  His father had a good job but

7  that relative wealth compared to the people that lived in that

8  country that Mr. Stammers had did not give Mr. Stammers the

9  support, the parental support that he needed.  He was basically

10  raised by a maid, as is verified by the letters that you

11  received, and that was difficult.  Mr. Stammers' love and

12  protectiveness for his father is I think extraordinary and it

13  has been verified with the discussion that I've had with his

14  family and the letters that your Honor has seen.  It was tough.

15  It was very tough for Mr. Stammers growing up.

16       He didn't make it through high school.  Knowing what I

17  know of Mr. Stammers and knowing his dignity and his work ethic

18  and just who he is, I'm convinced it is a product of his at

19  that point undiagnosed ADHD because Mr. Stammers did throw

20  himself into work and has worked hard and he has had for most

21  of his life a legitimate livelihood, but one that has not had

22  further tragic outcomes for him.

23       His first marriage broke apart and it resulted in

24  basically his oldest child being raised by his father and

25  stepmother under the guise that she wasn't his daughter, that

1    they were brother and sister.  What emotional effect that can

2    have on someone can be pretty difficult for someone who doesn't

3    go through that to really get in tune with that.  And it goes

4    from there.

5         Mr. Stammers, I'd say the loss of his father had a

6    profound effect.  When he was at the death bed of his father

7    holding his hand, that just put Mr. Stammers in a place where

8    people couldn't reach him for a number of years, and it led him

9    also I think to not be able to reach himself and who he is.

10   And I think that led Mr. Stammers to a psychological place

11   where then he could be open to making the decisions that he

12   has.

13        And by no means is Mr. Stammers trying to deny his

14   guilt at all.  He is very up-front.  He agreed to help Le Roux

15   do this.  But knowing the quality of Mr. Stammers' character,

16   which I think I have an idea.  I've known him now over two

17   years.  He is a man who does garner respect, I think.  He

18   conducts himself in a way that's worthy of respect.  And that

19   doesn't mean that everything he's done is perfect -- far from

20   it.  But I'm going to be the last to point out an infallible

21   person that I can find on this planet.

22        I know the government is going to retort, sure, people

23   make mistakes, but look at the decision that Mr. Stammers made

24   is tremendous and it was and it's horrendous.  But, you know

25   what, Mr. Stammers is paying for it basically for the rest of

1    his life.  He spent two months in a Thai prison in a cell

2    crammed with other people with a hole in the floor, insects, to

3    then being brought to the MCC where he's been ever since.  So

4    that's round one of the wake-up call that has occurred to

5    Mr. Stammers.

6            And Mr. Stammers had a number and has had a number of

7    ways to react to that.  The way that he has reacted considering

8    what he has been facing I think has been nothing less than

9    exemplary.  He has turned to his family and reengaged himself

10   with his mother, with his sister, and most importantly his

11   daughter, and that is something that is the hopeful part of

12   this process that I mentioned earlier is that Mr. Stammers

13   understands what led to his behavior.  He understands the

14   severity of the wrongness of his decision.  And he appreciates

15   the harm that he has caused not just to himself, but to the

16   people that he loves most on this planet and that is something

17   that he takes to bed with him every night.  It's something that

18   he thinks about.

19           He has given me permission to also disclose to the

20   Court, which I have, that he does suffer from depression and is

21   receiving medication for that.  And it's been emotionally

22   devastating for him.  But he's going to get through this, I

23   believe.  And he has the support of his family, which a lot of

24   people at this point wouldn't have, and that's very important.

25           He is very fearful about the future of his daughter,

how is she going to grow up where the soonest, no matter what

sentence your Honor wanted to give Mr. Stammers at this point,

there's no way that she'll see him a free man before her late

teenage years and that's the minimum.  But there's a real

possibility that he couldn't see her if you follow the

guidelines until she's in her thirties.  And the opportunities

that will be missed and can never be replicated, Mr. Stammers

feels that and thinks about it and is crushed by the weight of

that every waking moment at this point, your Honor, and I think

that's a sentence that no Court can inflict but one that

Mr. Stammers is willingly accepting because he realizes what

he's done and he's feeling it.  And I think that is the most

important step to rehabilitation is that acknowledgment by the

person who is facing these types of situations.

        I don't think in light of everything before the Court

that Mr. Stammers, first off, should receive any upward

departure.  Again, that was a permissive rule that your Honor

could invoke if your Honor found the facts.  I don't think that

your Honor has those facts before you to warrant any upward

departure in light of the arguments I made before and the

arguments I've making now and everything else that's before the

Court; I don't think it's warranted.

        I don't think a guidelines range is warranted

whatsoever the way it stands right now.  Probation even agreed

with that.  Their recommendation is in the 190-month plus

range, which is still below the guidelines range.  I would
submit that a sentence of 120 months is more than sufficient to
meet the needs and the aims of sentencing and justice in this
case.

          In looking at the Hunter case, the case that's not
joined with this, but the men who your Honor knows who were
basically charged with conspiracy to murder on behalf of Paul
Le Roux, the defendants who have been sentenced in that case
have been sentenced to 96 months to 240 months and that's for
actually taking steps to murder people.  Mr. Stammers stands
before you with a conviction, a criminal conviction for the
conspiracy to import drugs, non-violent, and with no allegation
that he used violence in any ways.

          I do, just so it's clear, I object to the government's
invocation of facts regarding arms transactions in their memo.
There is nothing about the facts of the arms transactions in
the PSR, so I didn't raise any formal objection because none of
that is in the PSR.  I don't believe it's properly before the
Court.  There's nothing to suggest that the arms transactions
that were included in the government's memo actually were
illegal.  As in the email cited by the government, the person
TC, who is negotiating for these weapons, said it was kosher,
meaning legitimate, and that he had back end user certificates,
meaning that although some people on this planet don't like
that arms are sold around the globe, it is a thriving

1   legitimate business that drives economies around the world.

2   And there is just nothing hard proof at this point that

3   Mr. Stammers, with what the government has submitted, was

4   involved in illegal arms transactions that should weigh on the

5   Court here.

6            So in closing, your Honor, I beseech the Court to see

7   Mr. Stammers as the whole person that he is, to see all of his

8   actions, and to impose a sentence that is below the guidelines

9   that has already been calculated.  Thank you.

10           THE COURT:  Okay.  Let me also give both sides notice

11  that I am contemplating a downward departure based on harsh

12  conditions of confinement for that time that Mr. Stammers spent

13  incarcerated in Thailand before he was extradited to the United

14  States.

15           Does either side wish an adjournment to think about

16  that, counsel for the defense, counsel for the government?

17           MR. MAHER:  No.

18           MR. BOVE:  No, your Honor.

19           THE COURT:  Okay.  I want to hear from the government

20  for a moment.  Defense counsel, you raised something about

21  another matter, about the Hunter case, and you talked about

22  some defendants who have been sentenced in that case.  Can you

23  just tell me more about what it is that you're getting at

24  there?

25           MR. MAHER:  What I'm getting at is that a different

G4SLSTAS                          Sentence

1    group of people that were working under the direction of Mr. Le

2    Roux, working on behalf of the government, have pleaded guilty

3    to their role in that separate conspiracy that the government

4    says is separate -- it was all Paul Le Roux actually -- and

5    they have been sentenced to some of them to 240 months for

6    admitting that they were actually planning to kill people.  And

7    so I think that there's -- and one person received 96 months.

8    I think they came in and did a safety valve proffer, but they

9    received 96 months.

10            So I'm just talking as far as trying to raise the

11   issue as far as sentence disparity that other people working

12   under the directive of Le Roux who were actually tasked with

13   killing people and agreed to do that received a sentence that

14   would, quote/unquote, be within the guideline range that

15   Mr. Stammers has right now.  And I think that would be totally

16   unwarranted looking at the differences between these cases.

17            Thank you, your Honor.

18            THE COURT:  Okay.  I am tasked with the responsibility

19   of avoiding unwarranted sentencing disparities.  I obviously

20   don't have that other case in front of me; I don't have much

21   information about that.  It seems that I would need additional

22   information to determine whether or not these disparities that

23   counsel are speaking about are actually unwarranted or whether

24   those were warranted disparities.  I don't know anything about

25   the facts of those cases or the facts of those defendants.

G4SLSTAS                          Sentence

So it may be that, well, I think I'm going to need
more information about that.  We may need to adjourn sentence
so I can get that information if that's something defense
counsel wants to rely on, this claim that there might be
disparities in terms of the sentence if I were to sentence
Mr. Stammers within the guidelines which, again, are advisory.
I'm not required to sentence him within the guideline range.

Let me hear from the government on that and anything
else you wish to raise.

MR. BOVE:  Judge, the defendants in the Hunter case --
and there are five of them -- are not at all similarly situated
to the defendant here and, therefore, from my perspective, it's
not necessary to conduct a hearing or provide time for further
submissions on that issue.  The one defendant that has been
referenced here in the Hunter case, Michael Filter, who was
sentenced to 96 months, he was safety valve eligible,
obviously.

The narcotics related conduct in that case focused
principally on supervision, that is, providing effectively
ground security for a purported drug shipment that was of
cocaine that was supposed to go from the Bahamas to the United
States.  It was basically a multiday operation relative to this
defendant's multimonth operation.

And I think most importantly, again, there was
actually methamphetamine in this case.  The effect of the DEA

G4SLSTAS                    Sentence

1    sting in this case was to connect two sets of criminal

2    operators to provide an actual 100 kilo load of

3    methamphetamine.  There was not actually drugs involved in the

4    Hunter case.  That was in fact a sting involving cocaine.  So I

5    don't think there's an adjournment necessary because I don't

6    think there's any merit to the argument that those defendants

7    in the case before Judge Swain are points of reference for your

8    Honor with respect to today's sentencing.

9              THE COURT:  All right.  Defense counsel.

10             MR. MAHER:  I raise it, I raise it in regard to the

11   aspect of a sentence involving a crime of violence versus

12   crimes not involving violence.  And we have the guidelines and

13   there are obviously some cases of nonviolent crimes that can

14   have much harsher sentences than crimes that involve violence.

15   My point of raising this is just more for the illustrative

16   point, your Honor, that the men who have pled guilty, again,

17   and it wasn't just drugs in that case.  It was the conspiracy

18   to assassinate people that they pleaded guilty to as well.

19   Those people are getting 240 months.

20             And so for someone who has pleaded guilty to trying to

21   kill somebody, I think, and that can just be a general point of

22   reference that your Honor takes in every case as to what is an

23   appropriate sentence for the facts and the person before you.

24   I don't think we need to have an adjournment for your Honor to

25   just take what is really I think more of just a common sense

1   notion into account.

2           THE COURT:  Hold on a second.

3           MR. MAHER:  I did provide that indictment as an

4   exhibit in my letter two days ago.

5           THE COURT:  Okay.  Hold on.

6           I understand Mr. Stammers probably wants to get this

7   behind him.  I understand that defense counsel is not currently

8   seeking an adjournment.  The government is not seeking an

9   adjournment.  But since this issue was raised by defense

10  counsel and I have an independent obligation to consider all

11  the factors in 18 U.S.C. 3553 and I understand defense counsel

12  may be sort of modifying the argument now, the argument

13  initially was just this is a guideline range that would be

14  appropriate for someone who is convicted of some sort of

15  violent crime and that's one thing.  But the fact that a

16  specific indictment was referenced and that there was a

17  reference to this individual being part of a conspiracy, albeit

18  a separate conspiracy and a different conspiracy involving

19  Mr. Le Roux, I think I have an independent obligation to look

20  at that, to get this information and look at it to make sure

21  that I do avoid any unwarranted sentencing disparities.  So I

22  think we're going to need to adjourn this matter so that I can

23  get this information.

24          But I do think while everyone is here we can continue

25  with the other aspects of this sentencing hearing while

G4SLSTAS                    Sentence

1    everyone is here.  Let me just find out from defense counsel, I

2    know Mr. Stammers is not a United States citizen.  Is anyone

3    here in the audience for Mr. Stammers here today?

4           MR. MAHER:  They were not able to travel.

5           THE COURT:  All right.  That's fine.  Let me hear from

6    the government in response to the other points that defense

7    counsel has raised.

8           MR. BOVE:  Thank you, your Honor.  As is indicated in

9    the PSR in this case, the defendant reports no legitimate

10   employment after 2010, and that's because in 2010 and

11   thereafter, the defendant began to work with individuals who

12   were working with Paul Le Roux and eventually ascended to

13   become, as I've said earlier, Paul Le Roux's right-hand man at

14   least and especially with respect to the offense conduct that's

15   before your Honor.  That conduct did involve weapons

16   trafficking.  That conduct also involved methamphetamine

17   trafficking.

18          Defense counsel has raised an objection about our

19   argument -- and it is a factual one -- that the defendant was

20   involved in prior shipments of methamphetamine.  We think the

21   record supports that conclusion, especially in the sentencing

22   context.  On November 20 of 2012, after methamphetamine was

23   seized, the defendant writes to Mr. Le Roux, call Shackels,

24   it's urgent.  A few days later he says he met with an

25   individual he referred to in the emails as BP to explain the,

G4SLSTAS                        Sentence

quote, stock delay.  The government's position is that that

phrase is a reference to the methamphetamine that he was aware

of before it was seized, he was actually trying to broker a

transaction with this individual BP, and now he's telling BP

there's going to be a delay because the drugs are gone.

A few days later, the defendant reports that BP would

like to continue with the transaction when the new shipment is

available.  I have reviewed the recordings in this case and one

in particular in January of 2013 where the defendant met with

confidential sources acting at the direction of the DEA.  Those

confidential sources referenced prior shipments of

methamphetamine sourced from North Korea.  They discussed how

purchasers in the United States were very pleased by the

quality of those drugs.  And the defendant, while not going out

of his way, to be clear, to say yes, that was what we sent,

he's clearly familiar with the fact that this organization that

he works for has previously transmitted methamphetamine and

it's clear from his responses, which are basically affirmative

responses, yes, it's hard to get this, yes, it's hard to

transmit, that he's aware that this process has taken place and

that he's participated in it.

And, finally, and this is with respect to the point

about the defendant's prior drug trafficking conduct.  In

Exhibit C, the operations plan, on page 3, under marina site

details and locations, he refers using code to "past visits."

The government's position is that there the reference to past

visits is prior receipt of maritime shipments of drugs.

Now, I focused on methamphetamine, your Honor, but you

can see from the emails that are a part of our submission that

methamphetamine was just one aspect of the narcotics that the

defendant helped to distribute.  He was also involved in

negotiations relating to large scale international cocaine

trafficking deals, as well as ecstasy deals.

So, frankly, the 100 kilo load that was part of the

DEA sting investigation is the tip of the iceberg with respect

to this defendant.  The guidelines that your Honor has

calculated at this point would be appropriate for that conduct

alone, for the 100 kilos, whether or not they existed.  But

your Honor knows that they did exist because of the structure

of this investigation, that is, that there was one side led by

Mr. Lim who had agreed to provide this to the other side, led

from our perspective, at least in a management way, by this

defendant, ultimately for those drugs to be provided to this

purported South American drug cartel.  So there was actually

drugs involved in this case, and there were many more deals

that were pending at the time.

Your Honor has had the benefit of being able to read

the defendant's words so that you can see he is a sophisticated

criminal.  This is a man talking about the use of fake

passports, checking whether or not they're viable.  He's using

G4SLSTAS                    Sentence

encrypted email communications.  He's careful in his operation

plan not to include too many details.  One of the reasons that

there is not a wiretap in this case or some other type of

incriminating recording of the defendant's statements beyond

what he said in face-to-face meetings is that the defendant was

too savvy to do things like that.  He thought the emails that

he sent were encrypted.  As a result of the cooperation with

Mr. Le Roux, we were able to obtain them.  He would not have

said things over the phone or using other means that were

interceptable.  He was frankly too smart for that.

          Your Honor can also see from the ops plan and the

emails around it that he was a sophisticated operator where he

was working.  He had people he referred to as political assets.

He talks about getting connections in the navy and in the coast

guard in order to facilitate the receipt of this shipment.

This is somebody who knew what he was doing and he was one of

the smartest and most sophisticated people working for Mr. Le

Roux and managing this team.

          On the point of this management argument, your Honor,

and aggravating role at this point I think considering it under

3553 and the departure that you've referenced, I should have

noted this earlier.  I think it's relevant at this point as

well.  In Exhibit B where he's laying out the different

features and pending questions of the ops plan, this is

Exhibit B to our submission, he lays out what he expects to be

G4SLSTAS                        Sentence

1    paid and this is on page 2 of the email.  The defendant expects

2    a $25,000 ops bonus upon completion of the shipment.  That

3    illustrates that the defendant understood that he was doing

4    more for Mr. Le Roux than others, that he had more

5    responsibility, more risk than others who were involved.  And

6    because of that and because of his experience and expertise, he

7    expected a bigger payment than some of the other employees.

8    For example, in his proposal, the political safety asset is

9    looking at a $15,000 payment, and the ground commander, I

10   believe, is looking it at a $5,000 payment.  This is all set

11   out in Exhibit B.  And that's just from the defendant's

12   perspective he was worth more because he was capable of more as

13   a sophisticated international criminal.

14        And that is all information mostly about the drug

15   trafficking conduct in which this man was involved.  The

16   weapons trafficking is separate but related and, I submit, a

17   critical feature of this sentencing if the aims of Section

18   3553(a) are to be achieved.

19        To the extent that your Honor is persuaded by the

20   argument that this information is not in front of you because

21   it's not in the PSR, then we request a hearing.  At that

22   hearing we would rely on the emails that I've appended to our

23   submission that I think are already properly before the Court.

24   Those emails coupled with recordings that were produced in

25   discovery demonstrate unequivocally that this man was at the

same time all these drug trafficking negotiations were going

on, was negotiating weapons deals with real people, actual

criminals, somebody he referred to as BP, who I mentioned

earlier in connection with separate methamphetamine

negotiations, somebody else he referred to as TC, and finally a

group of Serbians, all who were looking to participate in

weapons deals.

       Your Honor, these weapons transactions were not as

defense counsel just said a thriving legitimate business.  At

least part of them involved the defendant trying to broker

weapons deals involving the confidential sources.  Those

weren't -- the confidential sources didn't pretend to be

representatives of governments or legitimate businessmen.  They

pretended, purported to be representatives of a South American

drug cartel and he was seeking to help them obtain a number of

military grade weapons, including surface-to-air missiles.

       This is extraordinary conduct, your Honor.  It's

prolonged; it took place over the course of years.  I think

there's an ample basis in our submission to make all of those

findings.  This cannot be explained as a mistake or an accident

driven by what are admittedly difficult family circumstances at

the childhood level.  That doesn't excuse what happened here.

       The guidelines in this case are calibrated towards the

100 kilo load and, your Honor, our position is that certainly a

guideline sentence based on the calculation your Honor has made

1   today is appropriate and that for reasons including the

2   departure you're contemplating with respect to the managerial

3   discretion the defendant exercised and also the weapons

4   trafficking that is not at all accounted for in the guidelines,

5   when you look at the nature and circumstances of the offense

6   and you look at the features of the defendant who's here before

7   you that a very, very significant sentence is warranted in this

8   case.

9          THE COURT:  Okay.  Mr. Stammers, I'll give you an

10  opportunity to address me if you'd like.  You can say anything

11  you'd like regarding the appropriate sentence in this case.

12  You don't have to say anything, but if you'd like, now is your

13  opportunity.

14          THE DEFENDANT:  Thank you, your Honor.  I would like

15  to apologize to the Court.

16          THE COURT:  You can remain seated.  You don't need to

17  stand up.  I don't take any offense to that.  You can sit down

18  so you're closer to the microphone.

19          THE DEFENDANT:  I would like to apologize to the Court

20  and everyone that has been affected by this.  I wish I could

21  take it back that I worked for Paul Le Roux.  I wish I had

22  never met the man.  I wish David never introduced me to Paul Le

23  Roux, but I can't take that back.  I want to -- I've hurt my

24  family.  I've hurt my two daughters extremely.  I can never

25  take that time back.  I can't be there for them.  And I just

G4SLSTAS                        Sentence

1   want to apologize to everybody.  I hope, you know, this is a

2   lesson that I've learned and I can push forward from here.

3   Thank you.

4           THE COURT:  Okay.  Thank you.

5           We're going to need to adjourn the matter so I can get

6   more information regarding this Hunter case.  How soon can the

7   parties get me this information?

8           MR. BOVE:  Your Honor, we're prepared to submit to the

9   Court today the transcripts of the sentencings and the relevant

10  sentencing submissions for Michael Filter, who was the

11  defendant sentenced to 96 months, and Timothy Vamvakias, the

12  defendant who was sentenced to 240 months.  And there's one

13  more defendant in that case, Dennis Gogel.  We can send you

14  that transcript as well.

15          And our position ultimately, I think after your Honor

16  has had an opportunity to review these materials, is that these

17  defendants are not at all similarly situated.  And with respect

18  to the 240-month sentence that has been described here today,

19  Judge Swain made very specific findings about mitigating

20  circumstances that were unique to Mr. Vamvakias that resulted

21  in that 240-month sentence being appropriate.

22          THE COURT:  Defense counsel, do you wish to submit

23  something regarding this, and if so, how much time do you need?

24          MR. MAHER:  I would like the opportunity to -- I don't

25  have the materials that the government have discussed, so I'd

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

G4SLSTAS                      Sentence

1    like to see that.  And if there's anything else that I would

2    need to submit, I think I can get it to your Honor by Monday.

3              THE COURT:  Okay.

4              MR. BOVE:  Your Honor, we would ask for a day to make

5    a responsive submission, if necessary, or we'll notify the

6    Court that we're not going to put one in.

7              THE COURT:  Okay.  So let's have the government make

8    their initial submission -- you said today or tomorrow?

9              MR. BOVE:  Today, your Honor.

10             THE COURT:  Okay.  Today.  And we'll have the defense

11   file a response Monday.  We'll have the government, if they

12   wish to file a reply, to file that on Tuesday.

13             And how is May 25?  That's a Wednesday.  Does that

14   work for everyone?  And let's say at 10 o'clock.

15             MR. MAHER:  That's fine.

16             MR. BOVE:  Yes, your Honor.  Thank you.

17             THE COURT:  Okay.  And let me just also find out just

18   so I'm clear the government's position on the weapons

19   trafficking.  Your position is that I should consider that and

20   consider that how?  Are you claiming that these weapons are in

21   connection with this offense or that this is something I should

22   consider as part of the nature and background of the defendant?

23   What is your position as to how I should consider this weapons

24   trafficking?

25             MR. BOVE:  The government's position is that this

G4SLSTAS                        Sentence

weapons trafficking conduct took place on a parallel track in

the same time frame as the methamphetamine offense for which

the defendant is being sentenced right now and that your Honor

can and should consider it pursuant to Section 3553 when you're

evaluating the defendant before you, that is, it speaks to the

level of sophistication of this defendant and it speaks to the

level of his general culpability and, frankly, the scope of his

criminal conduct.

            If I could just have one moment, your Honor.

            THE COURT:  Sure.

            MR. BOVE:  Mr. Lockard makes the point which I think

is a good one is that it's not just that this weapons

trafficking conduct happened in the same time frame.  Even as

defense counsel has conceded today, there's one meeting in

Mauritius where the defendant is working to broker a deal

literally while the whole group is together, including the

confidential sources who are also supposed to receive the

methamphetamine.  In our view certainly the Mauritius meeting

with the Serbian drug traffickers is very much a relevant

feature before your Honor.  And then these other aspects of the

transactions that are going on with BP and TC, and these are

the aliases used by the defendant, that those also are relevant

under 3553 when determining the appropriate sentence.

            THE COURT:  So your position is that this meeting in

Mauritius and this discussion about weapons is relevant conduct

1    under the guidelines or no?

2            MR. BOVE:  I'm not sure if it's as a legal matter

3    relevant conduct.  It is in our view certainly relevant under

4    3553 that the same individuals that he was attempting to send a

5    hundred kilos of methamphetamine to he was also trying to set

6    up deals involving surface-to-air missiles.

7            THE COURT:  And I'll let the parties think about that.

8    I don't hold -- the parties can think about that some more.  I

9    just raise it with the parties only because in the context of

10   this discussion about the unwarranted sentencing disparities,

11   one of the points that was raised by the government is that the

12   individual who was sentenced to 96 months was very different

13   than Mr. Stammers because he was safety valve eligible and the

14   like.  The parties may want to look into whether or not

15   Mr. Stammers in this case is safety valve eligible.  I don't

16   know if that's the case or not, but the parties may want to

17   think about that.

18           Under 3553(f), the safety valve, the limitation on

19   applicability of statutory minimums in certain cases, the

20   requirements are that, one, the defendant does not have more

21   than one criminal history point as determined under the

22   sentencing guidelines; two, the defendant did not use violence

23   or credible threats of violence or possess a firearm or other

24   dangerous weapon or induce another participant to do so in

25   connection with the offense; three, the offense did not result

in death or serious bodily injury to any person; four, the

defendant was not an organizer, leader, manager or supervisor

of others in the offense as determined under the sentencing

guidelines and was not engaged in a continuing criminal

enterprise as defined in Section 408 of the Controlled

Substances Act; and, five, not later than the time of the

sentencing hearing, the defendant has truthfully provided the

government all information and evidence the defendant has

concerning the offense or offenses that were part of the same

course of conduct or part of the common scheme or plan, but the

fact that the defendant has no relevant or useful other

information to provide or that the government is already aware

of the information shall not preclude a determination by the

court that the defendant has complied with this requirement.

        Again, I'm not making any ruling on anything like

that.  But, again, since this was brought up in the context of

the potentially unwarranted sentencing disparities and, again,

it sounds like from what the government has indicated that

these sentencing disparities, to the extent there may be, that

they may not be unwarranted.  But I just wanted to raise that

with the parties as well.

        Yes, counsel.

        MR. BOVE:  With respect to that point, your Honor,

just for the record, the last prong, a truthful disclosure

about the conduct and the course of conduct, has not been

G4SLSTAS                          Sentence

1   satisfied at this point.

2            THE COURT:  I understand.  But that's why I was -- I

3   just wanted to make sure that everything before we continue on

4   and that the guidelines, again, I made a guideline

5   determination, but I just wanted to raise that with the parties

6   since that was raised.

7            Yes.

8            MR. MAHER:  I just want to make clear to someone

9   reading this transcript, that last statement by the government

10  does not mean that Mr. Stammers has made any disclosure to the

11  government and the government has evaluated that as not being

12  truthful.  Mr. Stammers hasn't made any disclosures whatsoever

13  to the government.  I just want that to be clear.

14           MR. BOVE:  That's correct, Judge.

15           THE COURT:  Okay.  All right.  That's fine.  I just

16  wanted to make sure there was no misunderstanding.  Obviously,

17  Mr. Stammers is not required to apply for the safety valve.  I

18  just wondered since counsel had both raised this issue of

19  eligibility if there was some predetermination by both or

20  either side that he was not eligible based on something in

21  there that I have now ruled against.

22           MR. MAHER:  And maybe I wasn't clear when I raised the

23  man who received -- Mr. Filter -- the 96-month sentence, I

24  wasn't implying that Mr. Stammers should be treated the same as

25  that man who received the safety valve.  What I was merely

G4SLSTAS                              Sentence

1    trying to illustrate with the Court was there was a range for

2    those defendants and I was just citing the range.  That's all,

3    your Honor.

4              THE COURT:  That's fine.  I just wanted to put that

5    out there so that the record is complete.

6              Anything else from the government?

7              MR. BOVE:  No, your Honor.  Thank you.

8              THE COURT:  Okay.  Anything else from the defense?

9              MR. MAHER:  No.  Thank you.

10             THE COURT:  All right.  So we're adjourned and I will

11   think about the appropriate sentence.  I will get the

12   submissions from the parties.  And I will consider again that

13   potential upward departure, as well as that downward departure.

14             Okay.  Thank you.  Have a good day.

15                              o0o

16

17

18

19

20

21

22

23

24

25